327 N.W.2d 576 (1982)
In the Matter of the Petition for Disciplinary Action against James J. NELSON, a Minnesota Lawyer.
No. 81-1371.
Supreme Court of Minnesota.
December 17, 1982.
Rehearing Denied January 13, 1983.
*577 Michael J. Hoover, Director Lawyers Professional Responsibility, and William J. Wernz, St. Paul, for appellant.
James J. Nelson, Minneapolis, pro se.
Heard, considered and decided by the court en banc.
PER CURIAM.
The Lawyers Professional Responsibility Board filed a complaint against respondent, James J. Nelson, an attorney in this state, which charged him with several violations of the Code of Professional Responsibility. This court appointed the Honorable Glen W. Swenson, Judge of Wright County Court, to act as referee and hear the petition for discipline. A hearing was held on June 28 and 29, 1982, on the allegations of the December 24, 1981, petition.
On July 30, 1982, Referee Swenson made findings of fact, conclusions of law and recommended that respondent be suspended for six months and severely reprimanded.
This matter was heard before this court sitting en banc on November 1, 1982. The Director of the Lawyers Professional Responsibility Board was represented. The respondent did not appear. He waived his right to oral argument in his brief. No transcript of the June 28 and 29, 1982, hearing before Referee Swenson was ordered by either respondent or the Director of Lawyers Professional Responsibility; therefore, pursuant to Rule 14(d) of the Rules on Lawyers Professional Responsibility (1982), the findings of fact and conclusions of the referee are deemed conclusive.
Based upon the referee's findings we learn the following: Respondent James J. Nelson has been licensed to practice law in Minnesota since October 16, 1968. He has served as officer or chairman of several community organizations. He was appointed by the Minneapolis City Council to the Truth in Housing Commission, and presently serves as its vice-president. He was elected to the Board of Directors of the Minneapolis Chapter of the Audubon Society, and presently chairs a committee to create the first Photographic Nature Sanctuary in Minnesota. He taught real estate law for two years and is presently working out of his home on a major lecture series for National Audubon Wildlife Films.
The petition for disciplinary action filed against respondent alleged six counts of unprofessional conduct. Four of those counts originated from respondent's representation of the estates of Oscar and Olive Hartz.

Count One
Respondent drafted a Will and Trust for Oscar Hartz, who died on May 11, 1973. Mr. Hartz was survived by his wife, Olive Hartz, and a daughter, Mrs. Shirley Arms. Mrs. Arms was appointed personal representative of her father's estate. At the time of death Mr. Hartz possessed $108,920.90 in multi-party accounts, held jointly with Mrs. Arms and Mrs. Hartz.
Respondent represented to Mrs. Arms that she was not entitled to any share of *578 the multi-party accounts. He did not advise her to retain her own counsel. Respondent advised Mrs. Hartz to transfer the bulk of said accounts to her own name solely. On November 7, 1980, after six days of trial, the Hennepin County Probate Court awarded Mrs. Arms $47,542.77 as her after-tax share of the joint accounts.
The referee concluded that respondent's failure to advise Mrs. Arms and Mrs. Hartz regarding Mrs. Arms' interests in the joint-tenancy bank accounts damaged his client and reflected adversely on his fitness to practice law, violating DR 1-102(A)(6) and DR 7-101(A)(3) of the Minnesota Code of Professional Responsibility.

Counts Two and Three
On or about October 6, 1976, respondent arranged to borrow $15,984.60 from Mrs. Hartz to use as part of a settlement in his divorce proceedings. Olive and Oscar Hartz had been in the business of building and remodeling homes. Respondent purchased a home from Oscar Hartz in 1970 and financed the cost by a contract for deed. In connection with his loan from Mrs. Hartz in 1976, respondent revised the contract for deed to add the $15,984.60 to the principal. The revised contract was executed by respondent and Mrs. Hartz. Although the revised contract appears to obligate respondent to pay Mrs. Hartz $50,000, including $19,789.81 in cash, respondent claims that he was obligated to pay only $30,210.19 in monthly installments over 20 years.
Respondent admitted that he and Mrs. Hartz had differing interests with respect to the contract, but made no written disclosure to her of such interests or of the possible effects of them on his judgment on her behalf.
On November 7, 1977, Olive Hartz executed a Last Will and Testament drafted by respondent. Under Mrs. Hartz' will, respondent was appointed trustee over several trust accounts and was to "audit and enforce" conditions related to the receipt of certain payments. Among the payments to be made into the trust accounts were respondent's contract for deed payments on the house he had purchased from the Hartzes. Respondent was thus given the authority to monitor a trust into which his own contract for deed payments were to be made.
Respondent and Mrs. Arms had a dispute over attorney fees claimed by respondent for his work on the estate of Mrs. Hartz. Respondent did not make payments on the contract for deed for October, November and December, 1978, or January, February and March, 1979. Respondent made no written disclosures to Mrs. Hartz or Mrs. Arms of his differing interests regarding the contract for deed and the trust provisions of the will.
The referee concluded that respondent's drafting of a contract for deed for purchase of his home from his client, Mrs. Hartz, and his drafting of Mrs. Hartz' will with trust provisions making him monitor of his own payment obligations involved clear conflicts of interest that could not be waived after purported oral disclosures. The referee found that these conflicts violated DR 1-102(A)(6), DR 5-101(A), DR 5-104(A) and DR 5-105(A) of the Minnesota Code of Professional Responsibility.

Count Four
After Mrs. Hartz' death on December 7, 1977, Mrs. Arms was appointed personal representative for probate of Mrs. Hartz' will. Respondent acted as attorney for the estate. On January 18, 1979, Mrs. Arms formally discharged respondent as attorney for the estate as a result of a dispute over his legal fees. Following his discharge, respondent reported alleged violations to tax authorities, the probate court, and the Minnesota Securities Division. The allegations involved the purported failure of Mrs. Arms as personal representative of her mother's estate to report certain lifetime transfers by Mrs. Hartz to Mrs. Arms and her family. The referee found that respondent made these allegations without a reasonable basis and in bad faith. The referee stated that "[r]espondent reported these alleged transfers as facts when to his knowledge they were at best conjecture and at worst fabrication" and that respondent had attempted *579 to use clients' confidences to their detriment and to his own advantage.
The referee concluded that respondent's allegations violated several disciplinary rules, including:
(1) misrepresentation, in violation of DR 1-102(A)(4) and (5); and
(2) unauthorized disclosures of information actually or purportedly received from clients to their detriment, in violation of DR 4-101(B)(1), (2), and (3); and
(3) harm and harassment to Mrs. Arms in violation of DR 7-101(A)(3) and DR 7-102(A)(1), (2), and (5).

Count Five
Respondent notarized numerous unsigned deeds and tax affidavits in the Olive Hartz estate. On September 24, 1976, respondent and Mrs. Hartz signed the contract for deed referred to above. Respondent caused the contract to be notarized as having been acknowledged on October 7, 1976. It was not acknowledged at that time.
The referee concluded that respondent's notarizing and causing notarization of unsigned documents or incorrectly dated documents violated DR 1-102(A)(4) (fraud and misrepresentation) and (6) (fitness to practice law).

Count Six
On October 20, 1977, a warning was sent to respondent by the Lawyers Professional Responsibility Board concerning the use of a professional card indicating respondent practiced law and other professions. The cards violated DR 2-102(E), which was later deleted from the Minnesota Code of Professional Responsibility when it was amended on May 29, 1980. Prior to the deletion of DR 2-102(E) from the Code, respondent used letterhead stationery listing his professions in a manner similar to the listing on the business card.
The referee concluded that respondent's continued use of professional stationery with several professions listed violated then-effective DR 2-102(E).
It is the recommendation of the referee that respondent be severely reprimanded for his unethical conduct and suspended from the practice of law for a period of six months. In a memorandum attached to his recommendation, the referee stated that he had "seriously considered recommending suspension from the practice of law for a period of one year."
The referee found that respondent's ethical violations were intentional and had a serious impact on the parties involved. It is the referee's position that respondent's failure to inform Mrs. Arms of her potential interest in joint bank accounts forced her into subsequent litigation where she recovered $47,542.77 as her share of the accounts and approximately $42,000 in federal and state tax refunds for Mrs. Hartz' estate. Her legal expenses in obtaining these monies and in defending herself against respondent exceeded $45,000. Respondent's acquisition of a loan from Mrs. Hartz and drafting of a revised contract for deed to include the borrowed amount resulted in serious questions as to whether respondent was obligated to pay $50,000, or $30,210.19 as he claimed. Respondent's appointment of himself as trustee of a trust into which he was to make payments on the contract for deed could be looked upon as simply a careless mistake. His subsequent refusal, however, to make the contract payments into the trust account for six months during a dispute over his fees was an intentional abuse of his fiduciary position.
Finally, the referee found that respondent's use of confidential information allegedly acquired during the attorney-client relationship against Mrs. Arms was unprofessional and unacceptable. The use of confidential information to the detriment of a client is a grave ethical violation. The seriousness of the violation is enhanced by the referee's finding that some of the allegations were "falsely stated," that others were "at best conjecture and at worst fabrication" and that respondent's actions were taken "maliciously without the express or implied authorization of Mrs. Arms or Mrs. Hartz."
In his brief respondent challenges many of the findings of the referee. The *580 findings of the referee are deemed conclusive under Rule 14(d)[1] of the Rules on Lawyers Professional Responsibility unless respondent or the Director orders a transcript within five days. This was not done. Respondent claims that he was never notified by the referee of his findings of fact, conclusions and recommendation, as is required by the rule. Respondent was notified, however, by the Director of the referee's findings, conclusions and recommendation by letter dated August 24, 1982.
Our conclusion is therefore to follow the recommendations of the referee. We stated in In re Scallen, 269 N.W.2d 834, 841 (1978), that "[w]e have in the past and will in the future continue to place great weight upon the recommendations of the referee concerning disciplinary sanctions."
The respondent is hereby reprimanded for his unethical conduct and suspended from the practice of law, with the right to reapply to this court for readmission after a period of six months from the date of this opinion.
NOTES
[1] Rule 14(d) of the Rules on Lawyers Professional Responsibility provides:

The referee shall make findings of fact, conclusions, and recommendations, file them with this Court, and notify the respondent and Director of them. Unless the respondent or Director within five days orders a transcript and so notifies this Court, the findings of fact and conclusions shall be conclusive. One ordering a transcript shall make satisfactory arrangements with the reporter for his payment. The reporter shall complete the transcript within 30 days.